## JAMES H. ASHMEAD AND OTHERS *vs.* ABRAHAM COLBY AND OTHERS.

During the pendency of a suit in chancery brought by a corporation and sundry individuals, its stockholders, against A. and others, for the cancellation of certain subscriptions of the individual petitioners to the stock of the corporation, and the repayment of certain moneys and the cancellation of certain notes obtained from the corporation, claimed to have been procured by the combined fraud of the respondents, A. died and his death was suggested on the record. Afterward the other respondents called out for the trial of the cause a committee to whom the case had previously been referred, and upon an application before the committee by the petitioners for

Ashmead *v.* Colby.

a postponement to enable them to bring in the legal representatives of A., the respondents objected, and the trial proceeded ; the committee during the progress of the hearing, which was continued with occasional sessions for several months, being reappointed with the consent of the respondents and the trial proceeding without any objection on their part on account of the neglect of the petitioners to bring in the representatives of A.   A. resided at the time of his death in the state of New Hampshire, where an administrator was immediately after appointed who also resided there, and he left no assets within this state.   The committee having made their report, the respondents remonstrated against its acceptance on the ground that by the death of A. the suit had abated and had not since been revived.   Held, that the respondents by the course which they had taken, had waived the objection.

Whether, if the objection had not been waived, and had been made seasonably, the fact that A. resided and died without the jurisdiction of the court, that his administrator was appointed by a foreign court, and also resided without the jurisdiction, and that there were no assets within the jurisdiction of the court upon which an administrator could be appointed, would not have been a sufficient answer: *qu.*

It was also held, that the bill ought not to be dismissed on the ground that, in consequence of the representatives of A. not being parties, it was impracticable to pass a decree that would do justice to all parties, inasmuch as the remaining respondents were responsible for the acts of A. with whom they had combined in the fraud, and could properly be ordered to pay to the petitioners the money fraudulently obtained and enjoined against negotiating the notes.

And that it was no objection to such a decree that it did not appear what interest the remaining respondents had in such notes, as between themselves and the representatives of A. who not being parties were not heard, since the rights of such representatives would not be affected by the decree, and would be considered without prejudice whenever they should institute proceedings to enforce them.

It was held also that the bill was not multifarious, in seeking a cancellation of the subscriptions to the stock, a matter of personal interest to the petitioners, and a cancellation of the notes of the corporation and the repayment of moneys drawn from it, a matter of interest to the corporation, since the whole was a connected scheme on the part of the respondents for defrauding the petitioners in the sale of a tract of land, by inducing them, with a view to its purchase, to take the stock and advance their money, the respondents immediately receiving the money from the corporation, together with its notes, as the price of the land.

Also that it was no objection to decreeing a cancellation of the subscriptions to the stock of the corporation, that it might destroy the capital of the corporation and leave nothing for the payment of its bona-fide creditors, inasmuch as such creditors, not being parties, could not be affected by the decree.

Also that it was no objection to such a decree, that the petition did not allege a fraud upon the corporation.

The petitioners having tendered a reconveyance of the land to the respondents, which they refused to accept, and the land having since been sold on execution, on a judgment obtained upon one of the notes of the corporation, in a

Ashmead *v.* Colby.

suit brought by an endorsee, it was held that it was not necessary that the petitioners should still be able to make the tender of the conveyance, but that the actual value of the land should be deducted from the sum which the respondents should be ordered to pay.

Where on a trial before a committee in chancery an objection was taken generally to all the evidence of certain acts and declarations of A., and the evidence was admitted and a part of it was admissible,—it was held, that the ruling was not erroneous because a part of the evidence was inadmissible, that part not having been designated in the objection.

Where evidence of questionable admissibility had been received by the committee, and upon remonstrance against the acceptance of their report the court had found that the committee regarded the evidence as unimportant and that the finding would have been the same without it,—it was held, that while it is not always safe to rely on such a conclusion, especially where the evidence is at all calculated to influence the minds of .thetriers, yet, if it is ever proper to do so, it is where the justice of a cause is resisted by a long series of merely technical objections.

The petitioners claimed that the respondents had combined to defraud them in the sale of a tract of land in Virginia as containing gold when it contained none, and that B., one of the respondents, at different times when the petitioners were about to examine the tract, had mingled gold dust with the soil in particular places, and then caused them to examine the soil in those places and find the gold thus placed there. As a part of the evidence going to establish this fact, they offered an account book kept at a neighboring mine, containing entries of sales of gold dust to B. just before the times when they made the examinations, for the purpose of showing that B. had gold dust in his possession at those times. The book was regularly kept and the clerk who made the entries was dead. Held, that as a part of the chain of evidence going to establish the fact in question, it was proper for the petitioners to show that B. had gold dust in his possession at the times in question, that evidence of the sales to him at the neighboring mine was pertinent to prove this fact, and that the entries in the book were admissible in proof of the sales.

Held also, that the declarations of such clerk, made a long time after the entries were made, were not admissible for the purpose of impeaching the correctness of the entries.

Upon a hearing before a committee in chancery, the respondents gave notice that they should request a postponement at the close of the session for the purpose of procuring further testimony, and at the suggestion of the committee handed in a list of the witnesses whom they proposed to call at the adjourned hearing. The committee decided to hear at once all the testimony then ready and at the adjourned session to hear no witnesses on the part of the respondents, unless for special cause, except those named in the list. The respondents acquiesced in this ruling and proceeded with the trial. At the adjourned session the respondents offered the depositions of three witnesses not named in the list and the committee refused to hear them. Held, in overruling a remonstrance against the acceptance of their report, that the committee had power to adopt the rule in question, both as a reasonable con-

dition in granting the postponement requested, and as a reasonable rule for the expediting of the business before them.

Questions of fact decided by a committee in chancery will not be reviewed by the court upon a remonstrance detailing the whole evidence.

And the finding that a tender of a conveyance of land has been made, is a finding of fact, although involving the question as to what in law constitutes a tender.

And the finding of facts by a committee can not be impeached, upon a remonstrance, by showing that the evidence on which it was made was procured by bribery and corruption ; the remedy in such case being by an application to the committee for a further hearing, or to the court for a new trial.

THIS was a petition in chancery, brought by the Randolph Mining Company, a corporation, and sundry individuals, who were stockholders thereof, praying for the surrender of certain notes given, and the repayment of certain moneys paid, by the corporation to the respondents, and the cancellation of certain subscriptions of the individual petitioners to the stock of the corporation, and for an injunction. The petition was dated Sept. 26, 1850. The case was referred to a committee, by whom the following facts were found.

Previous to the 31st day of December, 1849, a contract had been entered into, which was then subsisting, by Abraham Colby, one of the respondents, and one Robert F. Stockton, for the purchase from the said Stockton of a tract of land in the county of Spottsylvania and state of Virginia, containing about 366 acres, and known as the Pulliam tract—and afterward a contract, which was also then subsisting, between John L. Colby and Miles C. Burt, who were also respondents, and the said Abraham Colby, by virtue of which the said John L. and Miles C. were entitled to a share in the profit of the sale of the land by said Abraham Colby, and thus became jointly interested with him therein. The price which the said Abraham Colby had contracted to pay for the land was $8,000, which was much beyond its real value It was claimed to have some value as a gold mine, but it contained no gold except in such small quantities, and so thinly sprinkled in some portions of the soil, that the cost of collecting it would necessarily far exceed its value, so that for all purposes of a gold mine it was entirely worthless. About the 31st of December, 1849, the three respondents

Ashmead v. Colby.

above named combined and jointly engaged in endeavoring to effect a sale of the tract to the petitioners, and in inducing them to become interested in a corporation to be formed for the purpose of purchasing it at the price of $100,000, and of working the same as a mine; and in order to accomplish this object they represented to the petitioner, James H. Ashmead, that the land contained a valuable gold mine, that the business of mining could be carried on upon it to a very great profit, and could be conducted most conveniently by means of an incorporated company; and proposed to him to make such representations to others, and to procure with others such acts of incorporation and organize such a company, which company should become the proprietors of the tract, and carry on the business of mining thereon. They further represented to the said Ashmead and requested him to represent to the other petitioners, that the said Abraham Colby and said Robert F. Stockton had theretofore owned jointly a large tract of mining land, including a tract known as the Whitehall tract, and the said Pulliam tract, and on a division of the land the said Abraham had taken the Pulliam tract as better than the Whitehall tract; that the mine on the Pulliam tract was more valuable than the mines on the Whitehall tract, though the mines upon the latter were exceedingly valuable; that the surface washings alone on the Pulliam tract would pay for the property, and that the stockholders of the proposed corporation would never be called on to advance the second installment; that there was no gold mine in Virginia more valuable than the mines on the Pulliam tract; that a shaft or excavation had been dug upon the land by the former owner, from which great quantities of gold had been taken; that $13,000 dollars worth of gold had been taken from the shaft at one time; that while the workmen were digging in it and taking out gold, the earth caved in upon them, and destroyed the life of one of them, and that in consequence thereof and for no other reason the further digging was abandoned; that until the time of such abandonment those working the mine had been taking out large quantities of gold, and that if the work should be resumed at

the shaft large quantities of gold could be procured there-from. These representations were immediately after laid before the other petitioners by the said Ashmead. The respondents named also exhibited to said Ashmead and others of the petitioners specimens of quartz containing gold and specimens of gold, which they represented to have been taken from the Whitehall mine, and stated that the Pulliam tract would yield specimens of quartz and gold as rich and valuable as those so exhibited, and laid before the petitioners a map of the Pulliam tract, with surface washings and numerous strata or veins delineated thereon, which map they affirmed to be a true representation of the tract, and that a large portion of the veins delineated were gold-bearing veins.

It was afterward arranged between the petitioners and the three respondents named, that some of the petitioners should visit the tract with them and test the productiveness of the mines by actual experiment, to enable the petitioners to decide upon the expediency of becoming interested therein ; and in pursuance of the arrangement and at two different times prior to the purchase of the tract, in January and March, 1850, some of the petitioners visited the tract with the respondents named for the purpose, and while so there together at each time a small quantity of soil was selected from the tract for the purpose of testing the value of the surface washings, and the respondents named at the time, and afterward before the purchase, represented to the petitioners that the soil was selected at random from the surface, and that there were thirty acres or more of the tract over the whole of which the surface washings were equally valuable.

It was found by the committee that the respondents, John L. Colby and Miles C. Burt, at each of said times, secretly and with the intent to deceive the petitioners, and while the experiments for testing were in progress, deposited and mingled in the soil where it was about to be tested, a quantity of gold, either in the form of dust or amalgum, of the value of about thirty dollars at each time, procured elsewhere for that purpose, by means whereof the results of the experiments indicated that the soil of the tract abounded in

gold, and was highly productive and valuable; and that afterwards, and before the formation of the company, and before the agreement of any of the petitioners to become interested therein, the three respondents named caused the result of the experiments to be made known to all the petitioners, and represented to them that the experiments were made fairly, and that the results indicated the average surface washings on the tract. In order to induce the petitioners to form a company and to subscribe for stock in the same, they further offered that, if the petitioners would raise the residue of the sum of $100,000, they would take $30,000 of the stock, to be paid by a transfer of their interest in the Pulliam tract, for which they afterward did in fact subscribe Certain of the petitioners, induced by the foregoing representations, in behalf of themselves and others, joined with the said Abraham Colby in an application to the legislature of the state of Virginia for the incorporation of a mining company, and on the 13th day of March, 1850, Abraham Colby, James H. Ashmead, Samuel Woodruff, and Newton Case, and such other persons as might afterward be associated with them, were incorporated under the name of the Randolph Mining Company ; and the other petitioners, under the same inducement, became, with those just named, subscribers to the capital stock of the corporation, each to a large amount, amounting in the whole to the sum of $70,500, each subscriber paying in one-fourth of his subscription, and the whole sum thus paid in by them amounting to $17,500. The mining company was duly organized, and on the 27th day of March, 1850, purchased the Pulliam tract of the respondents named, and received a deed thereof executed by said Abraham Colby and his wife, the title being then vested in him, and agreed to give for the same $100,000, $30.000 of which was to be paid by the issue of stock of the company to that amount to the respondents named, and the remaining $70,000 was to be paid, one-quarter in cash, and the remainder in the promissory notes of the company, at four, eight and twelve months. The company paid to them in money, at the time of receiving the deed, the sum of

$16,250, and a note belonging to the company, executed by one of the petitioners, for the sum of $1,276.15, payable at four months; and to secure the payment of the residue the company executed and delivered to them twenty-four promissory notes, all of which were negotiable, all bearing date the 27th day of March, 1850, and payable to the said Abraham Colby or order, and amounting together to the sum of $52,500,—namely : six notes for $2,500 each, payable at four months; one for $2,000, payable at four months; one for $500, payable at four months; six for $2,500 each, payable at eight months; two for $1,000 each, payable at eight months ; one for $500, payable at eight months; and seven notes for $2,500 each, payable at twelve months; and stock to the. amount of $30,000 was issued to the three respondents named.

Six thousand dollars of the notes executed by the company had been paid by the company or by some of the petitioners before the suit was brought. One other of the notes, amounting to $2,500, had been in part satisfied by the levy of an execution on the interest of the company in the Pulliam tract, issued on a judgment recovered by one Hernden, as the indorsee of the note, against the company. The land was sold on the execution on the 7th day of July, 1851, for the price of $1,880, and by force of the levy and sale the title thereof became divested from the company and vested in the purchaser at the sale, in whom it has ever since remained vested. Personal property belonging to the company was also levied upon and sold on the execution to the amount of $352.61, and after applying the avails of the sales of the land and personal property on the execution, there remained a balance still due on the judgment unsatisfied, to the amount of $408.73.

After receiving the deed from said Abraham Colby the mining company took possession of the land, and immediately commenced mining operations thereon, and continued the same until some time in the month of August, 1850, when they were wholly abandoned.

Ashmead *v.* Colby.

The committee found that said land was altogether differ-
ent from the description of it given by the respondents
named ; that the surface washings were of little or no value;
that the shaft was not abandoned for the cause assigned by
them ; that the land was worthless for mining purposes ; that
the specimens represented as coming from the Whitehall
tract were not average specimens of its product, but were
selected on account of their peculiar richness ; that said
Abraham Colby had not taken the Pulliam tract by reason
of its peculiar richness, upon a division with said Stockton
or any other person ; that no portion whatever of the Pulliam
tract had yielded similar results to those obtained by the two
experiments made in January and March, 1850, or any result
whatever that would be profitable to the operator ; that the
petitioners had opened said shaft and that it contained no
mine and had no gold and no traces of any gold of any ap-
preciable value in it. They further found that the respon-
dents named, at the time of the bringing of the petition, in-
sisted, and that the said John L. Colby still insisted, upon the
benefit of the notes given by the company, and of the sub-
scriptions of the petitioners to the stock of the company, and
claimed that all the notes not paid were good and valid
securities in their hands ; that they had negotiated and parted
with some portion of the notes, and, at the time when the peti-
tion was brought, threatened and intended to negotiate and
part with the residue of them or to place them in the hands
of some third person who might sue the Randolph Mining
Company thereon.

On the 15th day of July, 1850, the Randolph Mining
Company executed in due form of law a deed reconveying
the Pulliam tract to said Abraham Colby, and on the 18th
tendered the same to him, and at all times since, until they
became divested of the legal title by the sale of the land on
the execution, had been ready to deliver the deed to him or
to his legal representatives, and had demanded of all the re-
spondents to return and surrender the notes and to repay the
money paid, which the respondents had refused to do.

It was further found that all the representations of the re-

Ashmead *v.* Colby.

spondents named, and which are above stated, were made fraudulently and with intent to deceive the petitioners, and when so made were part of them known by them to be false, and as to such as were not known to be false that they made them in entire ignorance whether they were true or not.

The committee also found that the other respondent, C. A. Peabody, had in his hands as trustee for the respondents first named, at the time of the bringing of the suit, all of the notes giving by the Randolph Mining Company which were not then matured, and then knew that the petitioners denied the liability of the company to pay the same.

The committee reported that the petitioners, for the purpose of showing that at each of the times of testing the soil of the Pulliam tract the respondents first named deposited in the soil large quantities of gold dust procured elsewhere, offered in evidence two entries of sales of gold to the said John L. Colby, bearing date January 26th, and March 1st, 1850, in a cash book or book of account of a neighboring mine known as the Culpepper mine, with proof that the clerk who made the entries was dead, and that the entries were made by the clerk in the regular course of business. To the admission of the book in evidence the respondents objected. The committee found that it was one of the regular books of account of said mine, and was kept in a regular manner, and by one Williams whose duty it was to keep the book; that the entries in question were made by him in the regular course of business and at the times when they bore date, and that he was now dead; and thereupon the committee received the book in evidence, and the same had a material effect on their finding.

The report of the committee was made to the March term of the superior court, 1857. Against its acceptance the respondents remonstrated on several grounds, the principal of which are the following.

1. That the said Abraham Colby, while the suit was pending in court, and after the filing of the answers therein and the appointment of the committee, previous to the trial before the committee, had deceased, and at the December

Ashmead v. Colby.

term of the court in the year 1855, his death had been suggested on the record and was well known to the petitioners; and that immediately after his death administration of his estate was duly granted to Joseph Burke of Madison, in the state of New Hampshire, where he dwelt at the time of his decease, who had ever since been the administrator of his estate; but that neither the said Burke nor any other person representing the said Abraham had been made a party to the suit, by means of which the suit had abated and had never been revived.

The petitioners objected to the evidence offered by the respondents in proof of these allegations, on the ground of their insufficiency in the law, but the court admitted the evidence, and found the facts as alleged with regard to the death of the said Colby, the suggestion of his death on the record, the appointment of the administrator, and the neglect of the petitioners to make the administrator a party to the suit; but the court further found, upon evidence offered by the petitioners, (which was objected to by the respondents on the ground that it should have been made the subject of a special reply to the remonstrance, and was not covered by a general denial, but which the court received) that, after the death of the said Abraham, and after the knowledge of both parties of the fact, the respondents called out the committee for the hearing of the cause, and made no objection to proceeding on the ground of his death, and objected to a postponement asked for by the petitioners for the purpose, among other reasons, of enabling them to make his representatives a party to their proceedings; and that the committee at each successive term of the court, after the death of the said Abraham, until their report was made and returned to the court, were re-appointed with the consent of the respondents, and that hearings were from time to time had before the committee without objection, nor was the objection ever made until by the remonstrance.

2. That the committee received evidence offered by the petitioners of certain declarations, acts and admissions of the said Abraham Colby, (which evidence was detailed in the re-

monstrance, but which it is not necessary to state here,) to which the defendants objected, both as being in itself inadmissible, and especially as inadmissible after the said Abraham by his death had ceased to be a party to the petition, and his legal representatives had not been made parties. The objection was taken to the whole evidence, and not to portions of it which might on particular grounds have been inadmissible.

The court found that the committee received the principal part of this evidence on the ground that a combination existed (which was found by them,) between the said Abraham and the other respondents, and that the declarations, admissions and acts were made and done in pursuance of the combination.   They received a part of it however on the ground that the said Abraham continued to be jointly interested with the other respondents in the notes and in the subject matter of the suit to the time of his death.

And with regard to a portion of the evidence, including a letter written by the said Abraham from New York in 1850, and introducing one Peabody as authorized to negotiate for him, the court found upon the testimony of the several members of the committee to that effect, that the committee regarded this evidence as unimportant, and that the finding would have been the same without it.   The evidence of this fact the respondents objected to, because inadmissible under a general denial of the allegations of the remonstrance, but the court received it.

3. That the committee refused to allow the respondents to read the depositions of Anthony Bracket, Randall Fish and James R. Chilton, which were, in all formal requisites and as to the relevancy of their matter, admissible, and at the taking of which the petitioners were present by counsel.

The court found the allegations of the remonstrance with regard to the character of these depositions and their rejection by the committee to be true, but further found that the depositions were rejected at a meeting of the committee held on the 9th day of December, 1856, under a rule adopted at a former meeting on the 20th of August, 1856; that at said

former meeting in August, it was expected that the testimony on the part of the respondents would be closed at that session, but the respondents not being prepared so to do, gave notice before proceeding to business, that they should ask for a postponement, to which the petitioners objected, unless it could take place at once ; that at the suggestion of one of the committee the respondents furnished a list of the names of the witnesses whom they expected to call at their next meeting, with the exception of one witness whom they could not then name, when the objection of the petitioners was withdrawn, and the trial proceeded ; that during the session the committee adopted a rule in substance as follows : that after receiving such testimony as the respondents were then prepared to give, the hearing should be postponed to a future day, when no evidence should be received in behalf of the respondents, except from the witnesses, a list of whose names had been given, with the exception of a witness not named, and excepting also that the committee in its discretion might for special cause receive the testimony of other witnesses ; and that at the adjourned meeting in December following, the committee, under the discretionary power reserved in said rule, did admit the deposition of one Hies, who was not named by the respondents in the list, upon the ground that he had unexpectedly returned to the country, and the testimony of one other witness who at the meeting in August was referred to as the one who could not be named, and under the rule rejected the depositions of Brackett, Fish and Chilton, they not being named in the list.

4. That the committee improperly received in evidence the account book of the Culpepper mines referred to by the committee in their report. On this point the court found that the facts were as set forth in the report of the committee, and that there was no evidence that any of the respondents except Abraham Colby was interested in said mine or had any connection therewith, nor that any of the respondents had any connection with said book, in such manner as to have any control over it ; but that there was evidence that Abraham Colby, John L. Colby and Miles C. Burt had knowl-

edge of the book and of the entries therein prior to the time
when the book was offered in evidence.

5. That the finding of the committee that the petitioners
had executed a reconveyance of the land and tendered the
same to the respondents, and had since, till the sale of the
land on execution, been ready and willing to deliver the deed
to the respondents, was not only without evidence to sustain
it, but contrary to the evidence introduced by the plaintiffs
themselves, and the only evidence in the cause, and was arbi-
trary, unfounded and unwarranted, and that the committee
acted arbitrarily, unjustly and improperly in making it. The
respondents set out in their remonstrance the whole evidence
on this subject, and alleged that the petitioners were bound to
prove both a reconveyance made in pursuance of a vote of the
corporation, which was not shown, and that the deed was
unconditionally tendered, which was not the fact, it being
offered only on condition of a return of the money and notes ;
and that it was the duty of the petitioners to be at all times
ready to convey the land on demand, which they had not
been, as the deed had been lost, and the land had been sold on
an execution against the corporation ; also that the effect of
the tender was destroyed by the petitioners retaining posses-
sion of the tract and working the mine. The petitioners
objected to any evidence in proof of these allegations of the
remonstrance, on the ground that it was not averred that any
question of law relating to the tender was presented to the
committee, or decided by them, and that the whole matter
relating to the tender, appeared from the remonstrance itself,
to have been disposed of as a question of fact by the com-
mittee, and as such that it could not be reviewed. The
respondents claimed that the finding of the tender of a con-
veyance involved questions of law and questions of fact, and
that upon this mixed question, they had a right to review the
decision of the committee before the court, by showing what
the evidence was, and that the same was in law insufficient
to warrant the fact therein found, and also claimed that they
had a right to show that the finding was made without any
evidence to support it, and was therefore arbitrary and

unfounded, and unjustly and improperly made. The court excluded the evidence upon the ground that it had no power to review decisions of committees upon mere matters of fact submitted to them or upon questions of law, not submitted to them on the hearing and decided by them ; but the court decided that if any error or mistake in matters of fact was claimed to have intervened, the report might be amended by the committee, and might be recommitted to them for that purpose.

.6. That evidence of the petitioners before the committee and on which the finding was made, was procured by bribery and corruption, for the purpose of imposing on the committee and the court. To evidence in support of this allegation the petitioners objected, on the ground that the allegation was vague and general, and on the ground that the testimony called in question related to matters of fact which had been referred to the committee, and heard and decided by them. The court sustained the objection and excluded the evidence.

Other points were made by the respondents in their remonstrance, which can be sufficiently understood from the opinion of the court.

The questions whether the report of the committee should be accepted, and if accepted what decree should be passed, and as to errors in the rulings of the court in the hearing of the remonstrance, were reserved for the advice of this court.

*Chapman* and *Fellowes* for the respondents.

1. The suit abated by the death of Abraham Colby, and from its nature could neither be tried nor decided without his or his representatives being parties. *Neal* v. *Haythorp*, 3 Bland., 551. *Mildrow* v. *Mildrow*, 2 Dana, 386. *Riley* v. *Wiley*, 3 id., 75.

2. The committee improperly received evidence of the acts and declarations of Abraham Colby, who was no longer a party, to affect the interests of the other respondents. These acts and declarations were made and done, some before and some after the sale. As to those which occurred before the sale, they could be admissible only on the ground of such

a combination as made each of the parties to it an agent. of all the others.   If it be claimed that such a combination is found by the committee, which we do not admit, yet clearly the acts and declarations after the sale, and after the pretended fraud was accomplished, are not admissible, because the agency had then ceased.

3. The committee improperly admitted the account book of the Culpepper mine in evidence, to prove the alleged fraud.   This was not the book of the present respondents, and they were in no manner interested in that mine or its accounts.

4. The committee improperly rejected evidence of the declarations of the clerk who made the entries in the book, and which went to impeach the entries.   The book receiving its whole effect as evidence from his entries, should in like manner be affected by his declarations as to those entries.

5. The committee improperly rejected the depositions of Brackett, Chilton, and Fish.   The rule adopted by the committee, that after a certain time they would receive no evidence except at their discretion, was arbitrary and unjust, and one which the committee had no power to make.   The respondents had made no stipulation as to the number of the witnesses to be introduced.

6. The committee having found the fact of a tender of a conveyance of the land, the court refused to allow the respondents, who had set out in the irremonstrance the whole evidence relating to the subject, to show that the fact was found without any evidence, and contrary to the evidence introduced by the petitioners themselves, which was the only evidence on the subject.   The court so ruled, on the ground that the finding was one of fact which could not be reviewed. But we claim that this is not to be regarded as an ordinary finding of fact, inasmuch as there was no evidence whatever on which to find it; and further that it was not a question of mere fact, but as presented by the remonstrance a question of law, since we claim that the facts do not constitute in law a tender, and where the facts are all given, the question

whether in law they constitute a tender must be wholly a question of law.   The petitioners in their bill allege that they tendered a conveyance in all respects legally executed, and have ever since been ready and willing to deliver it to the respondents ; to sustain this allegation they must show that the deed was in all respects duly executed by the corporation and in pursuance of a vote of the corporation, that it was unconditionally offered to the respondents, and that they have ever since been ready and able to deliver a valid deed of the premises.   But there was no vote of the corporation, the offer was made only on the condition that the money and notes be returned, and the property has since been sold on execution for the payment of one of the notes, and sold by their fault as they might have paid the note.   1 Sw. Dig., 290.   *Richardson* v. *Boston Chemical Laboratory*, 9 Met., 42.   *Brooklyn Bank* v. *Degrau*, 23 Wend., 342.   *Mitchell* v. *King*, 6 Car. & P., 236.   *Gordon* v. *Cox*, 7 id., 172.   The effect of the tender was also destroyed by the petitioners retaining possession of the mine and using it for their own purposes after the tender.   The legal effect of all these facts, when spread out upon the remonstrance, was as properly before the court for enquiry, as it would have been on a demurrer to a bill setting them out in the same manner.

7.  The court improperly excluded evidence offered by the respondents on their remonstrance, to show that the evidence on which the facts were found by the committee was procured by bribery and corruption.   A party who has procured testimony by such means ought not to be allowed to object to proof of the fact at any point where the proceedings may be arrested for the purpose.   Facts found on such testimony should not be considered as found at all.   It is an imposition on the court as well as the opposite party, and the court for its own sake should allow the enquiry.

8.  It is impracticable for the court to pass a decree that shall do justice to all the parties.   Abraham Colby was the owner of the land and had the title to the consideration paid for it in notes and money, the other respondents having merely an interest by virtue of a contract with him.   Thus

there was no privity between the petitioners and the other respondents. Abraham Colby is dead and the suit as to him abated. But if such privity in fact existed, there is nothing to show in what proportions the respondents were interested. How can the court decree what proportion of the notes shall be canceled, or what proportion of the money paid each shall refund? If the court decrees the repayment of the whole money, or the cancellation of all the notes, then injustice may be done to the representatives of Abraham Colby, who are not before the court and have not been heard.

9. And great injustice may be done to the *bona fide* creditors of the corporation, who are not parties to the bill, if the court shall decree a cancellation of the subscriptions of the petitioners to the stock of the corporation, as thereby its capital will be annihilated and no fund left for the payment of their claims. This certainly should not be done until they have been heard.

10. The bill is multifarious. It seeks distinct objects, viz., the cancellation of the subscriptions to the stock of the corporation, the repayment of the money paid for the land, and the cancellation of the notes. The first object is sought by the stockholders in their own behalf and for their private benefit, the other two by the corporation on its separate behalf.

11. There is no allegation in the bill that the corporation, in whose behalf the cancellation of the notes and the repayment of the money is sought, has been defrauded by the respondents.

12. The petitioners are estopped from seeking relief, because they have suffered the land to be sold on an execution against the corporation, and are therefore no longer able to reconvey it. It is a well settled principle that equity will not rescind a contract unless it can put the parties *in statu quo*. *Pintard* v. *Martin*, 1 Sm. & Marsh. Cha., 126. *Skinner* v. *White*, 17 Johns., 357. *Clay* v. *Turner*, 3 Bibb., 52. *Collier* v. *Thompson*, 2 Monr., 16, 4 id., 81. *Cooke* v. *Hardin*, 1 Litt. Select Cas., 374. *Martin* v. *Broadus*, 1 Freem. Ch., 35. *Camplin* v. *Burton*, 2 J. J. Marsh., 216.

*Grundy* v. *Jackson,* 1 Litt., 11.   *Robertson* v. *Hogsheads,* 3 Leigh., 667.

*Hungerford* and *T. C. Perkins,* for the petitioners.

1. It was not necessary to make the administrator of Abraham Colby a party to the suit, and if it had been the respondents have, by the course which they have pursued, waived the objection.   *Mechanics Bank* v. *Seton,* 1 Pet., 299. *Greenleaf* v. *Queen,* id., 138.   *Story* v. *Livingston,* 13 id., 359.   *Cannon* v. *Norton,* 14 Verm., 178.   *Wood* v. *Scott,* id., 518.   *Nash* v. *Smith,* 6 Conn., 421.   *New London Bank* v. *Lee,* 11 id., 112.   *Hartford* v. *Chipman,* 21 id., 488.   *Pond* v. *Clark,* 24 id., 370, 383.   And evidence to prove this waiver was admissible without any special answer to the remonstrance.   *Holabird* v. *Burr,* 17 Conn., 556.

2. Evidence of the acts and declarations of Abraham Colby was properly received by the committee, it being found that they were made in pursuance of a combination between him and the other respondents.   *Cowles* v. *Coe,* 21 Conn., 220.   If some portion of this evidence was inadmissible, yet as the objection was taken to the whole indiscriminately, and upon ground affecting the admissibility of the whole, the respondents can not now select a portion of it, and claim that there was error in the admission of such portion.   If any part of the testimony was admissible, it was the duty of the committee to admit the whole upon an objection taken to it as a whole.   If the respondents desired to question the admissibility of any part, taken by itself, it was their duty to object specifically to such part, that the respondents might if they preferred withdraw it, or the committee pass distinctly upon it and if inadmissible reject it.   *Waters* v. *Gilbert,* 2 Cush., 27.   *Whitside* v. *Jackson,* 1 Wend., 418. *Picket* v. *Allen,* 10 Conn., 146.   *Doane* v. *Cummins,* 11 id., 153.   *Story* v. *Livingston,* 13 Pet., 359.   *Dexter* v. *Arnold,* 2 Sumn., 108.

3. So far as some portion of the evidence as to the acts and declarations of Abraham Colby, and among them his letter from New York, were inadmissible, especially as re-

ceived in part on the ground of his interest in the notes, and not of the combination of the respondents with him, it is found by the court that the committee regarded it as unimportant, and that the finding would have been the same without it. Its mere technical admission ought therefore to have no effect. *Thorndike* v. *Boston*, 1 Met., 342. *Taylor* v. *Carpenter*, 2 Wood. & M., 1. *Allen* v. *Blunt*, id., 121. *Mason* v. *Crosby*, 3 id., 258. *Greenleaf's Lessee* v. *Brith*, 5 Pet., 131.

4. The depositions of Brackett, Fish and Shelton were properly rejected by the committee. It was within the province of the committee to prescribe such a rule to prevent any undue advantage of the adjournment to be taken by one party over the other, and to prevent the hearing being unreasonably protracted. The committee had a right too, in granting a postponement, to impose terms upon the party in whose favor it was granted. It may also be regarded on the facts found by the court, as an arrangement between the parties. *Cushing* v. *Billings*, 2 Cush., 158. *Nolton* v. *Moses*, 3 Barb. S. C., 31.

5. The questions of fact decided by the committee can not be reviewed by the court, and it was properly so held. *Parker* v. *Avery*, Kirby, 353. *Williams* v. *Welles*, 1 Root, 261. *Holabird* v. *Burr*, 17 Conn., 556. *Colgrove* v. *Rockwell*, 24 id., 584. *Goodrich* v. *Stanley*, id., 613. *Knapp* v. *White*, 23 id., 529. And the finding that a tender of a conveyance had been made, is a finding of fact, although the question may have been involved whether the facts proved constituted in law a tender. The court can not review the evidence on which the tender was found, since the committee do not report the facts, leaving the question of law, if it be one, for the court to decide, but have found that there was in fact a tender. This leaves nothing for the court to act upon. *Foot* v. *Wiswall*, 14 Johns., 304. *Copeland* v. *Hall*, 29 Maine, 93. *Reynolds* v. *Ocean Ins. Co.*, 22 Pick., 191. *Farnum* v. *Davidson*, 3 Cush., 232. *Cole* v. *Savage*, 1 Clark's Cha., 361.

6. The account book of the Culpepper mine was properly

admitted.  *Livingston* v. *Tyler*, 14 Conn., 493.  1 Greenl. Ev., §§ 115, 116, 120.

7.  The evidence offered by the respondents to prove that the testimony of the petitioners was procured by bribery, was properly rejected by the court.  The same evidence was fully heard before the committee, and had its proper effect there.  Besides, if the testimony had been thus procured, the fact should have been made the ground of an application for a new trial, and not of an impeachment of the finding itself. Further, the charge is made in such general and vague terms in the remonstrance, as not to admit of any definite issue being joined thereon, and the allegations of the remonstrance are therefore insufficient in law.

8.  The fact that the representatives of Abraham Colby are not parties, constitutes no reason why a decree should not be passed against the other respondents.  It is of no consequence that the precise interest of the remaining respondents in the money and notes is not known.  They are responsible for the acts of Colby, and can justly be ordered to refund the whole money obtained by the common fraud, and can be enjoined against disposing of the notes.  The representatives of Colby not being parties are not concluded by the decree, but can be heard whenever they shall institute any proceedings to enforce their rights.

9.  The bill is not multifarious.  The corporation was only used as a means of carrying out the fraud, and the bill asks only for the cancellation of all the obligations procured by the fraud.

10.  The petitioners ought not to be affected by the sale of the land on the execution.  They have once tendered a conveyance of it, which was refused.  The note for the payment of which it was sold was one which, being obtained in fraud, the corporation was not bound to pay, and the respondents ought not to have enforced the collection of it or negotiated it.  Besides, if the loss ought to fall upon the petitioners, the value of the land can be deducted from the money to be repaid by the respondents.

HINMAN, J. The first question is, whether the suit will abate in consequence of the death of Abraham Colby, his administrator not having been made a party. It is not necessary in this case to consider what would have been the effect of not bringing in, by a supplemental bill or otherwise, his representatives, if this objection had not been expressly waived by the conduct of the defendants after they had knowledge of such death. No doubt, as a general rule, all parties in interest ought in equity to be made parties to the suit, but one of the well established exceptions to this rule is said to be founded upon the impracticability of making the new or necessary parties, and getting them before the court, which is also said to occur when such new parties are without the jurisdiction of the court, and consequently can not be served by its process. Now whether the fact that Abraham Colby died without the jurisdiction, where his administrator also resides, and who was appointed such administrator by a foreign probate court, connected also with the fact that it does not appear that he left any property within the jurisdiction of this state, to administer which an administrator could have been here appointed, would have been a sufficient answer to this objection, had it been insisted upon at or before the hearing, we will not now determine; because we are satisfied that the going to trial without taking any exception on this ground, but on the contrary expressly waiving the objection, ought now to preclude the other defendants from objecting to such a decree against them as the facts found by the committee seem to call for.

Our decisions on this point seem to be conclusive. *Nash* v. *Smith,* 6 Conn., 421. *New London Bank* v. *Lee,* 11 id., 112. *Pond* v. *Clark,* 24 id., 383.

As to the declarations, acts and admissions of Abraham Colby, made for the purpose of accomplishing the common objects of the conspiracy and combination between him and the defendants, we do not now understand that any exception to the ruling of the committee is insisted upon. But the defendants claim that all his declarations, made after the sale of the land was accomplished, are inadmissible. The

court finds that most of the testimony relating to the acts, declarations and representations of the said Abraham, was admitted upon the ground that the committee first found a combination to have existed between the said Abraham and the other respondents, and they admitted said acts, representations and admissions as having been made and done in pursuance thereof and in order to carry it into effect. It is found however that a part of this testimony was received on the ground that the said Abraham, up to the time of his death, continued to be jointly interested with the other defendants in the notes given for the land and which are sought to be canceled in this suit, and in the subject matter of the suit itself. The respondents claim that this fact is incorrectly found by the court, as appears, it is said, by the record. But we are not referred to any part of the record where this appears, and we have discovered nothing which is inconsistent with the finding. We do not however rely upon this, because it appears from the remonstrance that the testimony of the witnesses on this point, as well as their testimony to acts done and declarations made in order to accomplish the fraud, was all objected to together, without making any distinction as to the declarations before and after the fraud was accomplished ; and we suppose it to be very well settled that if any part of the testimony objected to in this way is admissible, there can be no error in admitting the whole, unless that part which is objectionable is particularly pointed out, so as to give the party, if he chooses so to do, an opportunity to waive it. Besides, it is found by the court in relation to this part of the evidence now particularly relied upon as objectionable, as well as to a certain letter from Abraham Colby, that the committee regarded it as unimportant, and that the finding would have been the same without it. Now although it may not be safe always to rely upon a fact of this sort, where improper evidence has been received, especially if it was at all calculated to influence the minds of the triers, still if it is ever proper to do so, we think it must most obviously be in that class of cases where a just

judgment or degree is sought to be prevented by a long series of merely technical objections to the proceedings.

The testimony of Ezra Clark, Jr., as to what Mr. Tiffany said, was either withdrawn, or it was acquiesced in as unobjectionable. In either case it ought not now to be insisted upon as the foundation for error in the proceedings of the committee.

A book of the Culpepper mine containing entries of sales of gold to John L. Colby, which entries appeared to have been made shortly before the times when the plaintiffs made their examinations of the Pulliam tract, as it is called, for the purpose of discovering whether the surface soil contained gold according to his and the defendants' representations, was we think, properly admitted. This book was regularly kept, the entries were made by a person who was dead at the time of the trial and therefore could not be produced to testify to the facts which appeared by the entries. The plaintiffs claimed that the defendants through the instrumentality of John L. Colby, one of the defendants and a party to the combination and fraud, had mingled gold with the surface soil in particular places and then caused the plaintiffs to examine the soil and find the gold thus placed there; and that thereby they were induced to believe and did believe the fraudulent representations as to the richness of the whole tract. In the chain of evidence going to establish this fraud, it was obviously important to show that John L. Colby was prepared with gold in his possession, such as was afterwards found in the soil, and thus had it in his power to scatter it upon the soil where it was afterward found. It is true that of itself alone it would not be enough to satisfy the committee that he had been engaged in such a transaction; but connected with other suspicious circumstances, it might well be evidence on this point of the most satisfactory character, and if these entries were admissible they obviously tended to prove it. Indeed, unless they could in some other way be accounted for, they seem most conclusively to prove it. We do not in this case feel called upon to examine this point particularly, because we think the evidence clearly

within the principle recognized in the late case of *Livingston* v. *Tyler*, 14 Conn., 493. The point was fully discussed and considered in that case, and we can only say that we remain well satisfied with the correctness of the decision. The evidence therefore was properly received by the committee.

The testimony offered by the defendant for the purpose of impeaching the correctness of these entries in the book of the Culpepper mine, consisting as it did only of the declarations of the clerk who made the entries, made long after the date of the entries and after they were proved to have been made, in connexion with the further fact that the clerk was not on good terms with John L. Colby, but had a quarrel with him, was properly rejected by the committee. The proposition that a clerk, who has made entries in the books of his employers, can for any cause, after he ceases to be their clerk, confess away their rights by casual declarations made by him, and thus destroy the effect of entries made in the regular course of business, is so palpably erroneous as hardly to admit of illustration for the purpose of making it appear so. It is enough therefore to say that no authority has been cited in support of it.

The committee at one of its sessions adopted a rule that at the subsequent adjourned session they would hear only the evidence of particular witnesses whose names were given to the committee by the respondents, except for special cause; and as coming within the rule thus adopted, they rejected the depositions of Brackett and others. There is no pretence but that this rule was perfectly understood by the parties, and was adopted for their convenience; and in reference to it, the respondents did give a list of the persons whom they expected to improve as witnesses at the next meeting, and also examined such witnesses as they had present at the time the rule was made, which would not probably have been permitted had it been supposed that the respondents would disregard or attempt to evade the rule. Under these circumstances, it comes to the naked question whether the committee had power to adopt reasonable rules in respect to the trial of the case pending before them, for the

purpose of facilitating the trial, and to prevent any undue advantage by one party over the other. The respondents had given notice that they should ask for an adjournment to enable them to get further testimony. No one doubts the power of the committee to allow the adjournment; and while it might be very reasonable to allow it, it would still be proper to see that it was granted on such terms, or under such circumstances, as that it should not operate unfairly upon the opposite party. This necessarily gave the power to prescribe terms ; and the rule requiring a list of the witnesses expected to be called upon at the adjourned session was in substance but the terms upon which the adjournment was granted. It seemed to be acquiesced in by both parties at the time, and was under the circumstances a very reasonable rule as we think, and therefore not the foundation for a valid objection to the report.

The committee find that in July, 1850, the Randolph Mining Company executed in due form of law a deed reconveying the land to Abraham Colby, and tendered and offered to deliver the same to him, and that at all time since until they became divested of the legal title to said land by the sale of the same on execution, have been ready to deliver the said deed to him or to his legal representatives. This fact, so distinctly found by the committee, the respondents attempt in their remonstrance to have retried by the court, but the superior court on objection to the evidence refused to receive it, and this ruling of the superior court is complained of as erroneous. The defendants on this point rely chiefly upon the ground that they have set out in the remonstrance, as they say, all the evidence upon which the committee came to this result ; and they claim that the evidence thus recited was insufficient to justify the committee in coming to such a result. And this is called a question of law, proper to be considered by the court. This is so obviously an evasion of the rule making the finding of a jury, or of auditors, or of the court, or of a committee in chancery, which, in this respect, is a mere arm of the court, conclusive upon all matters of fact found by them respectively, as to require but little

except the bare statement of the proposition, to be said upon it. Indeed, the proposition if sanctioned would entirely destroy the rule making the finding of facts conclusive, because it is quite obvious that every fact founded upon evidence susceptible of being stated in a remonstrance might easily in this way be turned into a question of law. This, so far as our judicial history extends, has never been permitted. That the proceedings of auditors can not be revised except for the purpose of seeing whether they have mistaken the law, was first decided in *Parker* v. *Avery,* Kirby, 353, and was recognized as settled law in *Bradley* v. *Bassett,* 13 Conn., 560, and again in *Colgrove* v. *Rockwell,* 24 id., 584 ; and in *West* v. *Howard,* 20 id., 581, *Knapp* v. *White,* 23 id., 529, and *Goodrich* v. *Stanley,* 24 id., 613, the same rule was applied to the findings of committees in chancery. After such a long continued and uniform course of decisions this can hardly be considered as a point proper to be made.

The evidence offered by the respondents, for the purpose of showing that on the trial before the committee the petitioners exhibited testimony which they had procured by bribery and corruption for the purpose of imposing on the committee and the court, and procured the report of the committee upon such false testimony, was also properly rejected by the court, as going to impeach the report in respect to the finding of facts by the committee. The remedy of the respondents for a report procured by false testimony, is an application to the committee for a further hearing ; or an application to the court for a new trial, if there is any newly discovered evidence laying the foundation for such a complaint. We do not know what evidence upon this point was before the committee, or what further evidence the respondents might have to sustain the very serious charge which they make; and perhaps it is somewhat doubtful whether the charge would not on examination resolve itself into a complaint against the committee for finding the facts differently from what the evidence in the opinion of the respondents called for. If this is really all there is in the charge it was properly disposed of by the court, on the

ground of the conclusive character of the report as to matters of fact. But if there is any new evidence upon the subject, then, as has been suggested, the remedy is not to set aside the report, but to apply for a rehearing or for a new trial.

If there is nothing objectionable in the proceedings of the committee or of the superior court, then the remaining enquiry is, whether the bill must be dismissed because, as is claimed by the respondents, it is not practicable under the circumstances to pass a decree that shall do justice to the parties.

It is no doubt true that no decree ought to be passed which shall affect the rights of the representatives of Abraham Colby, as they have not been made parties to the suit, and he being dead can no longer be considered as a party for any purpose. But we do not agree to the proposition that there is no privity between Abraham Colby and the respondents in the perpetration of such a fraud, so as to make them liable for his acts. In a conspiracy such as this was, the parties engaged in it are all principals, and each of them is responsible not only for his own fraud, but for the fraud of all the parties combined with him in the common design. There can be no difficulty therefore in decreeing that the present respondents shall repay to the petitioners all the moneys which have been drawn from them in consequence of this fraud, together with interest thereon from the time the same was paid. But as the petitioners received a deed of the tract of land on which they supposed there was a valuable mine or mines, which, although worthless for mining purposes, is found to be of some value, it in ordinary cases would be decreed that they should reconvey it to the party of whom they received it, on the ground that the whole transaction was rendered void by the fraud of the respondents. This however can not now be done, as since they tendered a reconveyance of it to Abraham Colby, it has been sold on execution issued on a judgment on one of the notes given for it. Whether it was sold in consequence of the neglect of the plaintiffs, or whether it was caused to be sold on a note transferred to some friend of the respondents, for the purpose of getting back the land after they had ac-

complished their fraudulent sale of it, we do not know. Assuming however that it has gone from the control of the parties without any other fault of the respondents than that of assigning one of the fraudulently procured notes given for it to some *bona fide* holder, it seems just that the real value of the land should be deducted from the sum to be repaid to the plaintiffs. As therefore the value is found not to exceed $8,000, we think that sum should first be deducted from the amount thus to be repaid to the plaintiffs.

Again it is said that there is nothing to show in what proportions the defendants were or are interested in the notes which the court is asked to have given up to be canceled, and therefore it is impossible to frame a decree without doing violence to the interests of parties not before the court. But we see no difficulty in decreeing that the defendants, John L. Colby and Miles C. Burt, shall release and discharge all such interest as they or either of them may have in the fraudulently procured notes, and in enjoining them from assigning or in any mode attempting to enforce or collect them. This, while it is just to the parties before the court, will leave the interests of all other persons to be considered without prejudice whenever they shall institute proceedings for the purpose of enforcing any rights growing out of these instruments. A similar order may be made in respect to any rights which Burt or John L. Colby may claim as against the individual stockholders of the Randolph Mining Company growing out of their subscriptions to the capital stock of that corporation.

It is said again that the bill is multifarious in seeking the cancellation of the subscriptions for the stock in the corporation, which is sought in behalf of the stockholders alone, and the repayment of the money and cancellation of the notes, which is for the benefit of the corporation; and that there is no allegation of any fraud practiced upon the corporation; and that the court will not annihilate the capital of the corporation to the injury of its creditors.

So far as the *bona fide* creditors of the corporation are concerned they are not parties to the bill, and will not therefore be affected by any decree which may be made, and it is

no part of the object of the bill to affect them.   The defendants perpetrated the fraud by means of inducing the individuals who are plaintiffs to take the capital stock of the corporation and advance their money for it, that the money might be immediately withdrawn from the corporation for the benefit of the defendants under the form of a purchase of valuable property suited to the objects of the corporation, but in fact of very little value for any purpose compared with the price for which it was sold, and of none whatever for the purposes for which it was purchased.   The corporation was used therefore as a mere instrument by which to accomplish the design; and it was to defraud both it and the individuals induced to take its stock, that the whole series of fraudulent representations were made.   It is therefore substantially the case where certain individuals, together with a corporation, are all defrauded by one act or series of acts designed to accomplish the same fraud ; and this fraud operates very much in the same way both upon the individuals and the corporation.   It takes the money of the individuals to fill the stock of the corporation, and then withdraws it from the corporation for the benefit of the parties perpetrating the fraud. Under these circumstances we are satisfied that the bill was properly brought in the names of the individuals and of the corporation as plaintiffs.   We advise the superior court therefore to accept the report of the committee, and to pass a decree in conformity to the views expressed in this opinion.

In this opinion the other judges concurred.

Report to be accepted and decree for petitioners.