### Ernst Todt v. Mina Grande Mining Company et al.

#### Gen. No. 13,280.

FRAUD—*when equity ·has jurisdiction to relieve against.* Equity has jurisdiction to set aside a sale of corporate stock induced by the fraudulent representations of those in charge and control of the corporation the stock of which was in question, inasmuch as at law full relief could not be accorded, in this, that contingent stock liability would continue. In order to maintain such a bill it is not essential that either an allegation of insolvency, or a clearly stated case of liability in case of insolvency, be made to appear.

Bill in chancery. Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in this court at the October term, 1906. Reversed and remanded. Opinion filed July 1, 1907.

J. M. CAMELON, for appellant.

MOSES, ROSENTHAL & KENNEDY, for appellees.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

The appeal in this case is from a decree of the Circuit Court dismissing a bill in chancery of the appellant, Ernst Todt, against the appellees, the Mina Grande Mining Company, the Mercantile Finance Company and Thomas Rhodus, 'Sr., for want of equity. The original bill was filed by appellant as complainant against the appellees as defendants February 20, 1906. It was demurred to generally and specially by the only parties served or appearing, the Mina Grande

Mining Company and the Mercantile Finance Company, and May 24, 1906, the demurrer was sustained. An amended bill was filed June 14, 1906, and a general and special demurrer was also filed to this. It was sustained July 9, 1906, at which time leave to amend the prayer of the bill on its face was granted. To the amended bill thus amended, the demurrer to the amended bill was ordered to stand. Subsequently, on July 28, 1906, by leave of court previously obtained eleven several amendments to the bill were made. The bill should then, by the better practice, have been re-engrossed. It is in our opinion a practice not to be encouraged to allow substantial amendments to be made to a bill in chancery without re-engrossing. In the present case, however, the bill was not re-engrossed, but stands as it was filed on June 14, 1906, and amended on July 9 and July 28, 1906.

On motions of the defendants who had appeared the demurrer filed by them to the amended bill on June 19, 1906, was allowed to stand to the bill as finally amended.

September 18, 1906, this demurrer was sustained by the Circuit Court, and thereupon the bill was dismissed for want of equity. To the order dismissing the bill there was added a provision that the dismissal was without prejudice to a suit at law. The errors assigned in this court involve the sufficiency of the bill as finally amended as against a general demurrer and the causes of demurrer specially assigned.

The bill as finally amended makes this case:

From prior to April 23, 1902, the Mina Grande Mining Company was a Maine corporation. Its business was the operation and development of certain gold mining properties owned by it in Sonora, Mexico. On November 3, 1902, its capital stock was 2,000,000 shares of the par value of $1 each, and it was desirous of receiving subscriptions to it. The Mercantile Finance Company was a New Jersey corporation, do-

ing business in Chicago. Its business was stated by its officers to be the promotion of such companies as it had investigated and found sound. It was the authorized fiscal agent of the mining company to receive subscriptions to the stock of the mining company, and had joint offices with the mining company in the New York Life Building in Chicago. These offices were occupied solely by two brothers, Birch F. and Thomas Rhodus, M. C. Scully, and their staff of assistants, and the two Rhoduses were the business managers of both companies. The principal offices of both companies were in Chicago at the place mentioned.

On November 3, 1902, the complainant, Todt, made, as he believed, a contract of subscription for 3,000 shares of treasury stock of the mining company, being solicited to do so by Thomas Rhodus, who was president of the finance company, and director of the mining company, and represented himself as the agent of both. Complainant received a certificate for 3,000 shares of capital stock of the mining company, and paid Rhodus $900 therefor. On subsequent dates, between November 3, 1902, and August 5, 1903, the complainant made other subscriptions and paid the same price of 30 cents a share. On August 5, 1903, he made a subscription for 23,000 shares at 30 cents a share, but paid the consideration of $6,900 by conveying to Thomas Rhodus the equity of redemption in certain real estate, which equity was worth $7,000. The complainant, although desirous of conveying the said realty to the Mina Grande Mining Company direct, was induced to convey it to Rhodus by representations of Rhodus that it was the usual custom when a mining company took real estate for immediate sale, to have the same conveyed to an officer of the company. All the transactions of the complainant were made with, and all his payments were made to, Thomas Rhodus as agent. After the last subscription or purchase the complainant had 31,000 shares of stock in

the mining company, and had paid therefor at the rate of 30 cents a share, in cash and real estate, $9,300. The stock was issued to the complainant purporting to be fully paid. To within a short time of the filing of the bill, the complainant believed himself to be a stockholder by direct subscription from the mining company, and so acted. By a prospectus issued under the authority of the mining company and by Thomas Rhodus, it was represented to the complainant at the time he made the several subscriptions or purchases of stock, that the Mina Grande Mining Company had about 1,640,000 shares of said treasury stock available for the purpose of that corporation, and that there were no preferred shares of stock or bonds.

During June, 1905, the complainant became aware, by a circular letter of the Mercantile Finance Company, that it was proposed to issue bonds of the mining company, and thus learned for the first time that the mining company was in need of money and, contrary to his belief thitherto, did not have in its treasury the proceeds of 75,000 shares of treasury stock. After some indefinite information from Thomas Rhodus and another person, formerly on the directory of the mining company, the complainant instituted an investigation into the affairs of the mining company. The result was the discovery of a contract executed April 23, 1902, between parties of four parts, the Mina Grande Mining Company of the first part; the Chicago and Sonora Mining Company, an Illinois corporation, of the second part; various individuals, apparently then interested in the management of the Mina Grande Mining Company, of the third part, and Thomas Rhodus, Sr., the father of Thomas Rhodus and Birch F. Rhodus, of the fourth part.

The complainant had no notice of this contract at the time that he subscribed or purchased and paid for the stock, and knew nothing about it until the investigation alluded to was made. The complainant charges

that the mining company, its officers and directors, agents and representatives, concealed from him the existence of said contract, and its provisions, and that the finance company, acting as agent of the mining company, and in its own behalf as beneficiary under the contract, assisted the mining company to conceal said contract from the complainant.

This contract of April 23, 1902, among other things made provision that Thomas Rhodus, Sr., should dictate a new directory and management of the mining company in place of the then existing officers and directors, who should resign; that the capital stock of the Mina Grande Mining Company should be increased from 600,000 to 2,000,000 shares of the par value of $1.00 each; that the increase of 1,400,000 shares should be placed with 240,000 shares already in the treasury of the company, and that the whole 1,640,000 shares should be solely under the control of Thomas Rhodus, Sr., for the purpose of sale and distribution of the proceeds according to the contract, subject only to the right of stockholders to subscribe at the same price at which the stock should be offered to the public. It further provided that Thomas Rhodus, Sr., or any corporation named by him, should have the sale of the stock and be entitled to retain as commission everything received for the stock over two cents a share in the case of the first 300,000 shares sold, everything over three cents a share on the next 300,000 shares sold, everything over five cents a share on the next 400,000 shares sold, all above six cents on the next succeeding 400,000 shares sold, and all above seven cents on the next or last 240,000 shares.

In making this contract all the negotiations were carried on by the mining company with B. F. and Thomas Rhodus, who represented the Mercantile Finance Company as the fourth party, but before the execution of it, asked to have their father substituted as party of the fourth part, as they were to become of-

ficers and directors of the mining company, and were already well known as officers and managers of the Mercantile Finance Company. The finance company became, however, the real party of the fourth part, and has performed all acts to be performed by the party of the fourth part, so far as they have been performed, and reaped all the benefits therefrom.

This contract was carried out by the immediate change of the directors and managers of the mining company to the appointees of the Mercantile Finance Company. The principal offices of the mining company and the finance company then became joint and established at Chicago. At the same time the new directors resolved that all receipts derived from the sale of stock should be divided into two funds, a general fund and an expense fund, the latter to consist of everything received over and above the 2, 3, 5, 6 and 7 cents a share provided for by the contract, and to be at the disposal of Thomas Rhodus, Sr., or his assigns. They also authorized Thomas Rhodus, Sr., to use the mining company's name in selling stock and in all transactions connected therewith, and authorized the Mercantile Finance Company to represent itself as the fiscal agent of the mining company provided it would assist in the disposal of the treasury stock under the contract of April 23.

August 3, 1903, Thomas Rhodus, Sr., reported to the annual meeting of the company that he had sold all the stock placed at his disposal by the contract. The Mercantile Finance Company had then sold 1,100,000 shares of said capital stock at prices varying from 20 cents a share to 75 cents a share, in the aggregate for over $300,000, but the mining company had not received more than $55,000 therefor, the rest having been taken by the Mercantile Finance Company.

The complainant by his bill claims that prior to the making of his contracts of subscription to or purchase of the stock and payment for the same, the following

"false and fraudulent misrepresentations" were made to him, namely: That all money paid by him and all other persons taking stock in the mining company, except a small percentage commission paid to brokers' for selling the stock and except a small percentage of the stock going into a so-called guarantee fund system, would go or had gone into the treasury of the mining company, and was to be used in the development of the mining property. This representation was made personally to complainant by Thomas Rhodus, president of the finance company and director of the mining company, and by certain pamphlet prospectuses (which are appended as exhibits to the bill), issued by the mining company and the finance company.

Further, complainant charges in his bill.that the act of the mining company and its representations in concealing the contract was · equivalent to an express misrepresentation and was fraudulent as to him.

The complainant further charges that the misrepresentations were made to him to induce him to make purchases of stock, and that he would not have made said purchases except for them.

At an annual meeting of the stockholders of the mining company August 3, 1903, and at an annual meeting of said stockholders held August 1, 1904, the contract of April 23, 1902, was ratified by the vote of the stockholders, and at each of said meetings the complainant voted by proxy for said ratification, said proxy being the president or vice-president of the company, who had been given by the complainant a power of attorney to act with full power and authority for him in all business that might come before the meeting.

Complainant, however, had no notice of the vote approving said contract, or of the vote of his proxy for such approval, or any notice of the contract, or that it would be acted on at the meeting. He charges that the directors of the company caused said contract to

be ratified and the complainant's shares to be voted for such approval in pursuance of an improper purpose to bind the complainant without his knowledge.

The complainant has taken no action since his discovery of the foregoing facts which could be construed as a ratification of the purchases of stock by him.

Thomas Rhodus, acting in behalf of the Mercantile Finance Company, has conveyed to an innocent purchaser for value the real estate conveyed by the complainant to him as agent for the mining company.

The complainant, before bringing his bill, tendered to the Mina Grande Mining Company and the Mercantile Finance Company a surrender of the shares of the mining company held by him and demanded the return of the consideration paid by him therefor. The demand was refused.

The mining company has no visible and tangible assets in this state from which the complainant could satisfy any decree for money he might get against it. The finance company has ample means and is able to repay complainant the sum he has expended in the purchase of the mining company's stock, and is indebted to the mining company in a large sum on the unpaid par value of its stock.

The complainant represents in his bill his purchases of 31,000 shares of stock in the mining company was in effect a direct subscription from the company, and that for the difference between $31,000, its par value, and $9,300, which he paid for it, he is liable to creditors of the company in case of the insolvency of the same.

In consideration of all these matters the complainant prays for an answer from the defendants and for a decree declaring the concealment from him of the contract of April 23, 1902, to have been fraudulent, and all the misrepresentations alleged in the bill to have been fraudulent and made for the purpose of deceiving the complainant, and providing for the rescission

of the said several sales of stock to him, cancelling the several certificates of stock held by him, ordering his name removed from the books of the company, and terminating his liability as a stockholder of the company. He also prays that a full accounting be had of all money paid by him for the stock and the contract price of the real estate conveyed by him as a part of the consideration, and that the Mercantile Finance Company be required to pay to him all sums paid by him and withdrawn by the finance company from the treasury of the mining company; also that defendants, or such of them as may be found liable, be decreed to pay to complainant all sums, including the contract price of the realty conveyed, paid by the complainant · for the stock with interest thereon, and that in case a decree be entered requiring the mining company to pay said sums, that said decree may further provide that in case of the failure of the mining company to make said payments within thirty days from the entry of the decree, the other defendants shall make said payment.

The special grounds of demurrer appended to the general demurrer filed by the mining company and finance company (the two defendants appearing) are twelve in number. But seven of them, however, are insisted on by appellees in their argument, namely:

1.  The bill as finally amended is multifarious as to parties.

2.  It is multifarious as to subject-matter, setting up two distinct controversies.

3.  It is inconsistent in that it seeks a rescission of a sale to appellant of certain shares of stock, and also a cancellation of a contract which the appellant has no standing to attack save as a stockholder.

4.  The bill shows that appellant, after having knowledge of the matters on which he bases his right to rescind the contracts of purchase of the stock of the mining company, asserted and exercised rights as

a stockholder of the company, and hence is debarred from claiming any right to rescind said contracts of purchase.

5. The bill shows that appellant ratified the contract of April 23, 1902, between the mining company and Thomas Rhodus, Sr., at the annual meetings of August 3, 1903, and August 1, 1904, and that he is therefore estopped from attacking the validity of the said contract.

6. The bill shows that appellant has a full, complete and adequate remedy at law.

7. The bill is insufficient in its allegations, because representations made to appellant at the time of the purchase of said shares of stock in the mining company, that money realized from the sale of the stock of the mining company would go into the treasury of the corporation, would not amount in law to a representation of a present or existing fact, but would amount only to a promissory representation, which cannot form the basis of a decision.

We think the demurrer should not have been sustained, but that the defendants should have been called on to answer the bill. We shall therefore reverse the decree dismissing the bill and remand the cause with directions.

In briefly setting forth our reasons for this conclusion, we deem it best to speak with reserve of the merits of the cause as stated in the bill. As we are reminded by appellees, we have in this appeal to deal solely with allegations—not with facts—and a very different aspect is given to allegations which involve charges of misrepresentation and fraud by even slight variations in evidence. We have involved here alleged motives, intentions, concealments and representations. We do not intend by this opinion to decide that any particular conduct or words amount to such concealment or misrepresentation. We only say that the case made by the bill, taking its statements with

their legitimate breadth of meaning, calls for an answer. The allegations amount to a charge that the complainant was induced to purchase stock in a mining company which he had reason to believe, from the representations made to him by the defendants, was in possession of large resources which were necessary properly to develop the value of its property, when, as a matter of fact, a contract concealed from him previously made by the Mining company for the benefit of the defendant, the Finance company, had disposed of those resources in a manner which was gainful to the persons who induced him to purchase, and who practically constituted the Finance company, but which was an unconscionable and losing proposition for the Mining company in which he purchased the stock. In other words, it is charged that the officers of the Finance company, who were also officers of the Mining company, having secured from the Mining company an unconscionable contract, made misrepresentations to the complainant of the value of the stock of the Mining company and of the value of its resources, and by them secured for the profit of the Finance company a sale of the said stock to him, which would not otherwise have been made.

In such a state of things, if it existed, we think, there would be a remedy to be found by the courts for the complainant's grievances. Indeed this seems to be conceded, for one of the grounds most strenuously insisted on by the appellees in support of the demurrer is that there is a remedy at law—a view which seems to have been taken by the court below, since the dismissal of the bill is expressed to be "without prejudice to a suit at law."

We do not think that the remedy at law is complete and adequate in the sense which precludes equitable relief. We think that under the allegations of the bill, should they be proven in the full sense claimed for them by the complainant, the complainant is entitled

to be placed as nearly as possible in the position he occupied before the subscriptions or purchases made by him, and relieved by decree certainly so far as the court has power to relieve him from any possible or contingent liability to creditors as a stockholder of the Mina Grande Mining Company.

This is a part of the remedy to which Cook on Corporations, vol. 1, sec. 152, says the aggrieved purchaser is entitled. It seems to us to be sanctioned by the authorities cited by complainant. Barcus v. Gates, 89 Federal 783; Asmead v. Colby, 26 Conn. 287; Tyler v. Savage, 143 U. S. 79; Bosley v. National Machine, etc., 123 N. Y. 550; Venzuela v. Kisch, vol. 36 Law Journal Reports, 1867, p. 849. And, as counsel suggest, it is consistent with the course adopted and apparently approved in Murray v. Tolman, 162 Ill. 417, and Coolidge v. Rhodes, 199 Ill. 24.

Therefore, if it be conceded that neither the fact that charges of fraud are made the groundwork of the bill, nor that an accounting is asked from the defendants, furnishes by itself a reason for sustaining the jurisdiction of equity, and that a suit at law could be maintained for money improperly obtained from the complainant for the stock—propositions which counsel for appellees insist upon—nevertheless equitable jurisdiction may be invoked to make the remedy complete and adequate.

It was said in Schack v. McKey, 97 Ill. App. 460, a case cited by appellant, that while it is not every fraudulent act that will authorize a court of equity to take jurisdiction, in cases where complete justice cannot be done at law equity *will* interfere.

It is objected, however, that the cases above cited from Illinois are not of importance as authority because of controlling reasons therein for the appeal to chancery jurisdiction which are not found in the case at bar. That may be conceded without affecting the axiomatic principle on which they, as well as the other

cases cited, rest, that if adequacy of remedy is only to be obtained in equity, equity will take jurisdiction.

It is further objected that there is no allegation of the insolvency of the mining company, and therefore no proof of present liability on the part of complainant to creditors. Moreover, it is said that it is clear that there would be such a liability in case of such insolvency. Therefore it is argued there is no necessity for a cancellation of the complainant's stock holding.

It is needless to say more about this than that in our opinion neither an allegation of insolvency nor a clearly stated case of liability in case of insolvency is necessary to justify the bill. A doubtful and contingent liability is sufficient, and that at least the bill states. But it is said the desirability of, or even the equitable right to, such a decree as complainant asks would not justify the bill here, because it appears on the face of the bill that such a decree by an Illinois court would be nugatory and incapable of execution. The point, even if otherwise well taken, would seem to fall when it is pointed out that the allegations of the bill (not in this respect fully abstracted) include one that the principal offices of the corporation are maintained in Chicago and that the officers and managers are to be found here.

We are not impressed with the importance of the other objections made to the bill. We deem it fatally multifarious neither as to parties nor as to subject-matter. Nor do we think that its prayers are inconsistent. As finally amended, at least, it seeks no cancellation of the contract of April 23, 1902, but only that its alleged concealment may be considered in connection with representations made to complainant fraudulent as to him.

Again, it seems to us no more properly to be called a bill for a money decree with incidental relief of rescission and cancellation, than one for rescission and

cancellation with incidental relief of payment of money. If equity has jurisdiction of the cause, it will of course retain it to furnish all proper relief.

It is urged with vigor that because the proxy of the complainant under a power from him voted in 1903 and 1904 at the annual meetings for a formal ratification of the prior acts of the directors of the mining company, complainant is now estopped from complaining of those acts and their effects. Many cases are cited by counsel which are claimed to be applicable. The arguments and the authorities have all been considered by us, but this is a branch of the case which we do not wish to discuss at length in the present stage of the litigation. It is only necessary for us to say that we think by the allegations as they stand, no ratification with such knowledge, either express or implied, of the acts which are the basis of the complainant's claim as would estop him in this suit is set forth. What the evidence will show must be left for a trial, and in the absence of evidence it is not for us now to pass on what would and what would not constitute an estoppel or laches.

The decree of the Circuit Court dismissing the amended bill as amended is reversed and the cause remanded with directions to the Circuit Court to overrule the demurrer.

*Reversed and remanded with directions.*